## UNITED STATES DISTRICT COURT
### DISTRICT OF MARYLAND
#### (Southern Division)

| | |
|---|---|
| **DAVIN POKOIK**, Individually and on Behalf of All Others Similarly Situated, 120 East 56th Street, Suite 835 New York, New York 10022 | **No.** |
| | **CLASS ACTION** |
| Plaintiff, | **COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
| vs. | **DEMAND FOR JURY TRIAL** |

**HUMAN GENOME SCIENCES INC.**
14200 Shady Grove Road
Rockville, MD 20850
<u>Serve on</u>:  Resident Agent:
The Corporation Trust Incorporated
351 West Camden Street
Baltimore, Maryland 21201

and

**H. THOMAS WATKINS**
4705 Monaco Circle
Bethesda, MD 20814

and

**TIMOTHY C. BARABE**
855 Jones Street
San Francisco, CA 94109,

and

**A.N. KARABELAS**
461 Court St.
Portsmouth, NH 03801,

and

**RICHARD J. DANZIG**
3670 Upton Street NW
Washington, DC 20008,

and

**JURGEN DREWS**
6983 Bridgestone Court
Naples, FL 34108,

and

**MAXINE GOWEN**
19 Paper Mill Road
Newton Square, PA 19073,

and

**TUAN HA-NGOC**
8 Kitson Park Dr.
Lexington, MA 02421,

and

**JOHN I. LAMATTINA**
973 Fell Street # 973
Baltimore, MD 21231

and

**AUGUSTINE LAWLOR**
11 Carriage Lane
Salem, NH 03079,

and

**DAVID P. SOUTHWELL**
350 Main Street
Concord, MA 01742,

and

**ROBERT C. YOUNG**
150 Lynnebrook Lane
Philadelphia, PA 19118,

and

2

**GLAXOSMITHKLINE PLC**
980 Great West Road Brentford
Middlesex, ENG TW8 9GS
United Kingdom,

Defendants.

Plaintiff Davin Pokoik ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the defendants' public documents, announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Human Genome Sciences Inc. ("HGS" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.   Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION AND OVERVIEW

1.     This is a class action for violations of the anti-fraud provisions of the federal securities laws on behalf of all purchasers of the publicly traded securities of HGS between July 20, 2009 and November 11, 2010 (the "Class Period"), who were damaged thereby (the "Class"), including all persons who acquired the common stock of HGS pursuant and/or traceable to the false and misleading registration statements and prospectuses (collectively, the "Registration Statements") issued in connection with the Company's July 28, 2009 public offering of 26.7 million shares of common stock at $14 and its December 2, 2009 public offering of 17.8 million

shares of common stock at $26.75 (the "Offerings"). This action asserts claims against HGS, its senior executives and directors and GlaxoSmithKline plc ("GSK") (collectively, "defendants").

2.     HGS is a commercially focused biopharmaceutical company. During the Class Period, defendants made materially false and misleading statements concerning a potential new drug, Benlysta, also called belimumab, for the treatment of Systemic Lupus Erythematosus ("SLE"), which is a chronic, life-threatening autoimmune disease. Specifically, defendants failed to disclose that in clinical drug trials they conducted, Benlysta was associated with suicide.

3.     On November 12, 2010, the U.S. Food and Drug Administration ("FDA") posted its analysis of Benlysta and the drug's association with suicide in clinical drug trials.

4.     As a result of this disclosure, HGS shares dropped $2.88 or nearly 11%, to close at $23.60 per share on November 12, 2010.

## JURISDICTION AND VENUE

5.     The claims alleged herein arise under § § 10(b) and 20(a) of the Exchange Act of 1934 (the "1934 Act") (15 U.S.C. §§78j(b) and 78t(a) and Rule 10b 5 promulgated thereunder by the SEC (17 C.F.R. §240.10b 5).

6.     This Court has jurisdiction over the subject matter of this action pursuant to §27 of the 1934 Act.

7.     Venue is proper pursuant to §27 of the 1934 Act. The Company is located in this District, and the false and misleading statements were made in this District.

## THE PARTIES

8.     Plaintiff Davin Pokoik purchased HGS securities during the Class Period as set forth in the attached Certification and was damaged thereby.

4

9.      Defendant HGS is a biopharmaceutical company incorporated in Delaware and headquartered at 14200 Shady Grove Road, Rockville, MD 20850-7464.  HGS's common stock is traded under the symbol HGSI on the NASDAQ Global Market ("NASDAQ").

10.     Defendant H. Thomas Watkins ("Watkins") was, at all relevant times, the Company's Chief Executive Officer ("CEO") and a director on the Company's Board of Directors ("Board").  In addition to issuing other public statements and speaking publicly during the Class Period, Watkins signed or authorized the signing of the false and misleading Registration Statements.

11.     Defendant Timothy C. Barabe ("Barabe") was, at all relevant times, the Company's Chief Financial Officer ("CFO") and Senior Vice President.  In addition to issuing other public statements and speaking publicly during the Class Period, Barabe signed or authorized the signing of the false and misleading Registration Statements.

12.     Defendant A.N. Karabelas, Ph.D. ("Karabelas") was, at all relevant times, the Company's Chairman of the Board.  In addition to issuing other public statements and speaking publicly during the Class Period, Karabelas signed or authorized the signing of the false and misleading Registration Statements.

13.     Defendant Richard J. Danzig ("Danzig") was, at all relevant times, a director on the Board.  Danzig signed or authorized the signing of the false and misleading Registration Statements.

14.     Defendant Jurgen Drews, M.D. ("Drews") was, at all relevant times, a director on the Board.  Drews signed or authorized the signing of the false and misleading Registration Statements.

#1633226v.1

15.     Defendant Maxine Gowen, Ph.D. ("Gowen") was, at all relevant times, a director on the Board.  Gowen signed or authorized the signing of the false and misleading Registration Statements.

16.     Defendant Tuan Ha-Ngoc ("Ha-Ngoc") was, at all relevant times, a director on the Board.  Ha-Ngoc signed or authorized the signing of the false and misleading Registration Statements.

17.     Defendant John L. LaMattina, Ph.D. ("LaMattina") was, at all relevant times, a director on the Board.  LaMattina signed or authorized the signing of the false and misleading Registration Statements.

18.     Defendant Augustine Lawlor ("Lawlor") was, at all relevant times, a director on the Board.  Lawlor signed or authorized the signing of the false and misleading Registration Statements.

19.     Defendant David P. Southwell ("Southwell") was, at all relevant times, a director on the Board.  Southwell signed or authorized the signing of the false and misleading Registration Statements.

20.     Defendant Robert C. Young, M.D. ("Young") was, at all relevant times, a director on the Board.  Young signed or authorized the signing of the false and misleading Registration Statements.

21.     The defendants referenced above in ¶¶ 10-20 are referred to herein as the "Individual Defendants."

22.     Defendant GSK is a pharmaceutical company headquartered in Middlesex, England.

## BACKGROUND

23.     Belimumab is an investigational human monoclonal antibody drug that specifically recognizes and inhibits the biological activity of B-Lymphocyte stimulator, or BLyS®. BLyS is a naturally occurring protein discovered by HGS that is required for the development of B-lymphocyte cells into mature plasma B cells. Plasma B cells produce antibodies, the body's first line of defense against infection. In lupus and certain other autoimmune diseases, elevated levels of BLyS are believed to contribute to the production of autoantibodies - antibodies that attack and destroy the body's own healthy tissues. The presence of autoantibodies appears to correlate with disease severity.

24.     Between October 2003 and February 2006, HGS conducted a Phase 2 placebo controlled, double blind clinical study of Benlysta code-named L02. When that study was complete, another study, LBSL99, began to track the patients who participated in study L02. LBSL99 continues to this day.

25.     In August 2006, HGS and GSK entered into a definitive co-development and commercialization agreement under which HGS had responsibility for conducting the belimumab Phase 3 trials, with assistance from GSK. The companies agreed to share equally in Phase 3/4 development costs, sales and marketing expenses, and profits of any product commercialized under the agreement.

26.     The Phase 3 development program for belimumab includes two double-blind, placebo-controlled, multi-center Phase 3 superiority trials - BLISS-52 and BLISS-76 - to evaluate the efficacy and safety of belimumab plus standard of care, versus placebo plus standard of care, in serologically active (i.e., autoantibody-positive) patients with SLE. This was the largest clinical trial program ever conducted in lupus patients. BLISS-52 randomized and treated 865 patients at 90 clinical sites in 13 countries, primarily in Asia, South America, and Eastern

Europe.  BLISS-76 enrolled and randomized 826 patients at 133 clinical sites in 19 countries, primarily in North America and Europe.  The BLISS-52 study began in May of 2007 and ended in July 2009. The BLISS-76 study began in December 2006 and ended in October 2010.

27.     On November 28, 2008, HGS and the Individual Defendants filed a shelf registration statement registering for sale up to $400 million of HGS securities that was amended April 29, 2009 and declared effective by the SEC on May 4, 2009 (the "Shelf Registration Statement").  The Shelf Registration Statement was signed by Individual Defendants Watkins, Barabe, Karabelas, Danzig, Drews, Gowen, Ha-Ngoc, LaMattina, Lawlor, Southwell, and Young and expressly stated: "We incorporate by reference any filings we make with the SEC after the date of this prospectus under Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act," and any subsequently-filed prospectuses.

## FALSE AND MISLEADING
## STATEMENTS DURING THE CLASS PERIOD

28.     On July 20, 2009, HGS and GSK issued a press release that stated in relevant part:

> ROCKVILLE, Maryland, and LONDON, UK - July 20, 2009 - Human Genome Sciences, Inc. (Nasdaq: HGSI) and GlaxoSmithKline PLC (GSK) today announced that BENLYSTA ™ (belimumab, formerly LymphoStat-B®) met the primary endpoint in BLISS-52, the first of two pivotal Phase 3 trials in patients with serologically active systemic lupuserythematosus (SLE). In the placebo-controlled BLISS-52 study, the results showed that belimumab plus standard of care achieved a clinically and statistically significant improvement in patient response rate at Week 52, compared with standard of care alone.  Study results also showed that belimumab was generally well tolerated, with adverse event rates comparable between belimumab and placebo treatment groups.

> "The BLISS-52 results demonstrated that BENLYSTA has the potential to become the first new approved drug in decades for people living with systemic lupus," said H. Thomas Watkins, President and Chief Executive Officer, HGS. "Given the limited treatment options currently available, patients would benefit greatly from potential new treatments. BENLYSTA is an outstanding example of the type of treatment HGS is working to develop and bring to patients.  Assuming

positive results in November from our second Phase 3 trial of BENLYSTA, we and GSK plan to submit marketing applications in the United States, Europe and other regions in the first half of 2010."

29.     On July 29, 2009, HGS filed a pricing prospectus with the SEC indicating it had pulled down from its $400 million shelf and sold 23,215,000 shares of its common stock at $14 per share (the "July Registration Statement").   The July Registration Statement expressly incorporated by reference in the July 20, 2009 press release and any filings made by HGS subsequent to the July Registration Statement.

30.     On August 3, 2009, HGS issued a press release that stated in relevant part:

ROCKVILLE, Maryland - August 3, 2009 - Human Genome Sciences, Inc. (Nasdaq: HGSI) today announced the closing of its public offering of 26,697,250 newly issued shares of its common stock at a price to the public of $14.00 per share, which includes 3,482,250 shares sold upon exercise by the underwriters of their option to purchase additional shares.  The net proceeds to the Company from the offering are approximately $356.7 million, after deducting the underwriting discount and estimated offering expenses.

31.     On October 20, 2009, HGS and GSK issued a press release that stated in relevant part:

ROCKVILLE, Maryland, and LONDON, UK - October 20, 2009 - Human Genome Sciences, Inc. (Nasdaq: HGSI) and GlaxoSmithKline PLC (GSK) today announced the full presentation of results from BLISS-52, the first of two pivotal Phase 3 trials of BENLYSTA ™ (belimumab) in seropositive patients with systemic lupus erythematosus (SLE).  The data, which will be presented today in Philadelphia at the 73rd Annual Scientific Meeting of the American College of Rheumatology (ACR), demonstrate that, in BLISS-52, belimumab plus standard of care achieved a clinically and statistically significant improvement in patient response rate as measured by the SLE Responder Index at Week 52, compared with placebo plus standard of care.  Study results also show that belimumab was generally well tolerated, with adverse event rates comparable between belimumab and placebo treatment groups.

"The BLISS-52 Phase 3 results presented at ACR demonstrate that the efficacy of treatment with BENLYSTA plus standard of care was superior to that of placebo plus standard of care," said David C. Stump, M.D., Executive Vice President, Research and Development, HGS.  "These data were statistically significant and were strongly supported across multiple measures of clinical effect and multiple

#1633226v.1

time-points. Of note, a greater percentage of patients receiving BENLYSTA were able to reduce their use of steroids."

Carlo Russo, M.D., Senior Vice President, Biopharm Development, GSK, said, "We have been pleased by the consistency of benefit demonstrated by belimumab in the BLISS-52 study, and we hope to confirm these results in the second Phase 3 study which is to report shortly. We very much hope that we will be able to deliver anew option for the treatment of this debilitating disease." Belimumab is an investigational drug and the first in a new class of drugs called BLyS-specific inhibitors. No new drug for lupus has been approved by regulatory authorities in more than 50 years.

32.     On October 29, 2009, HGS amended the Shelf Registration Statement. The amendment to the Shelf Registration Statement expressly incorporated by reference the July 20th and August 3rd releases and any subsequently filed prospectuses and was signed by Individual Defendants Watkins, Barabe, Karabelas, Danzig, Drews, Gowen, Ha-Ngoc, LaMattina, Lawlor, Southwell and Young.

33.     On November 2, 2009, HGS and GSK issued a joint press release that stated in relevant part:

ROCKVILLE, Maryland, and LONDON, UK - November 2, 2009 - Human Genome Sciences, Inc. (Nasdaq: HGSI) and GlaxoSmithKline PLC (GSK) today announced that BENLYSTATM (belimumab) met the primary endpoint in BLISS-76, the second of two pivotal Phase 3 trials in seropositive patients with systemic lupus erythematosus (SLE). BLISS-76 study results through 52 weeks showed that belimumab 10 mg/kg plus standard of care achieved a statistically significant improvement in patient response rate as measured by the SLE Responder Index at Week 52, compared with placebo plus standard of care. Study results also showed that belimumab was generally well tolerated, as demonstrated by a similar rate of discontinuations due to adverse events across treatment groups, with overall adverse event rates comparable between belimumab and placebo treatment groups.

"The BLISS-76 results confirm our view that BENLYSTA has the potential to become the first new approved drug in decades for people living with systemic lupus," said H. Thomas Watkins, President and Chief Executive Officer, HGS. "We take great pride in the innovation and scientific rigor that has made it possible to bring BENLYSTA to this point. We plan to submit marketing applications in the first halfof2010, following discussions with regulatory authorities in the United States, Europe and other regions. We will continue to

work with GSK to advance this drug to the market where it may benefit patients with significant need."

Carlo Russo, M.D., Senior Vice President, Biopharm Development, GSK, said, "The results from this second pivotal Phase 3 trial reinforce our belief that belimumab could deliver a significant therapeutic option for patients with lupus who have had no new treatment in fifty years. We look forward to continuing our collaboration with HGS in order to bring this important medicine to patients."

34.     On December 2, 2009, HGS filed the Prospectus with the SEC, which stated in

relevant part:

BENLYSTA

BENLYST A is a BLyS-specific inhibitor. We are developing BENLYSTA with GSK under a co-development and co-commercialization agreement entered into in August 2006. The Phase 3 development program for BENLYSTA includes two double-blind, placebo controlled, multi-center Phase 3 superiority trials - BLISS-52 and BLISS-76 -to evaluate the efficacy and safety of BENL YST A plus standard of care, versus placebo plus standard of care, in seropositive patients with SLE. This is the largest clinical trial program ever conducted in lupus patients. BLISS-52 randomized and treated 865 patients at 90 clinical sites in 13 countries, primarily in Asia, South America and Eastern Europe. BLISS-76 randomized and is treating 819 patients at 136 clinical sites in 19 countries, primarily in North America and Europe. The design of the two trials is similar, but the duration of therapy in the two studies is different - 52 weeks for BLISS-52 and 76 weeks for BLISS- 76. We designed the Phase 3 program for BENLYSTA in collaboration with GSK and leading international SLE experts, and the program is being conducted under a Special Protocol Assessment agreement with the FDA.

BLISS-52

On July 20, 2009, we, together with GSK, announced that BENLYSTA met the primary endpoint in BLISS-52, the first of two pivotal Phase 3 clinical trials in patients with serologically positive SLE. Based on an intention-to-treat analysis, BENLYSTA met its primary efficacy endpoint of superiority versus placebo at Week 52. A clinically and statistically significant improvement was shown in patient response rate for BENLYSTA plus standard of care versus placebo plus standard of care: 57.6% for 10 mglkg BENLYSTA, 51.7% for 1 mglkg BENLYSTA, and 43.6% for placebo (p=0.0006 and p=O.Oll for 10 mg/kg and 1 mglkg BENLYSTA, respectively versus placebo). Patient response was defined by an improvement in SELENA SLEDAI (a weighted cumulative index of lupus disease activity) score of 4 points or greater, no clinically significant BILAG (a clinical measure of lupus disease activity) worsening, and no clinically significant worsening in the Physician's Global Assessment (a measure of disease activity in clinical trials). Results for each individual component of the patient response rate

11

were consistent with the overall improvement shown for the primary endpoint. Results for pre-specified major secondary efficacy endpoints were:

• A significantly greater percentage of patients receiving BENLYSTA achieved a reduction in SELENA SLEDAI score of at least 4 points by Week 52, with 58.3% for 10 mg/kg BENLYSTA, 53.1 % for 1 mg/kg BENLYSTA, and 46.0% for placebo (p=0.0024 and p=O.O 19 for 10 mg/kg and 1 mglkg BENLYSTA, respectively versus placebo).

• Improvement in the Physician's Global Assessment at Week 24 was greatest in the 10 mglkg BENLYSTA treatment group versus placebo (p=0.0003 for 10 mglkg and p=0.27 for 1 mglkg BENLYSTA, respectively) with improvement observed within four to eight weeks.

• A higher percentage of patients in both BENL YST A treatment groups, versus placebo, had their average prednisone dose reduced by at least 25% from baseline to 7.5 mg per day or less during the last 12 weeks of study (p=0.053 for 10 mglkg and p=0.025 for 1 mglkg BENLYSTA, respectively versus placebo).

• Improvement in health-related quality of life at Week 24 as measured by the SF-36 Physical Component Summary ("PCS") (a survey for measuring health status and health related quality of life) score was not significantly different among treatment groups.  However, although not a major secondary endpoint, improvement in the SF -36 PCS score at Week 52 was significantly greater in both BENLYSTA treatment groups (p=0.025 for 10 mg/kg and p=0.027 for I mg/kg BENLYSTA, respectively versus placebo).

Study results also showed that BENLYSTA was generally well tolerated, with rates of overall adverse events, serious adverse events, infections and fatalities comparable between BENL YST A and placebo treatment groups.  Serious infections were reported in 5.9% of patients on placebo and 6.1% of patients on BENLYSTA.  The most common adverse events were headache, arthralgia, upper respiratory tract infections, urinary tract infection and influenza, and were also comparable between BENLYSTA and the placebo treatment groups.  No malignancies were reported.

35.   On December 3, 2009, defendants filed a pricing prospectus with the SEC indicating HGS had pulled down from its $400 million shelf for sale another 15,500,000 shares of its common stock, this time at $26.75 per share (the "December Registration Statement"). The December Registration Statement expressly incorporated by reference the July 20th, August 3rd, October 20th, November 2nd and December 2nd press releases and any filings made by HGS subsequent to the December Registration Statement.

12

36.    On December 8, 2009, HGS issued a press release that stated in relevant part:

ROCKVILLE, Maryland - December 8, 2009 - Human Genome Sciences, Inc. (Nasdaq: HGSI) today announced the closing of its public offering of 17,825,000 newly issued shares of its common stock at a price to the public of $26.75 per share, which includes 2,325,000 shares sold upon exercise by the underwriters of their option to purchase additional shares. The net proceeds to the Company from the offering are approximately $456.3 million, after deducting the underwriting discount and estimated offering expenses.

37.    On April 20, 2010, HGS and GSK issued a joint press release that stated in

relevant part:

ROCKVILLE, Maryland, and LONDON, UK - April 20, 2010 [note correction below made April 21, 2010]- Human Genome Sciences, Inc. (Nasdaq: HGSI) and GlaxoSmithKline PLC (GSK) today announced topline secondary endpoints from BLISS-76, the second of two pivotal Phase 3 trials of BENLYSTA ™ (belimumab) in seropositive patients with systemic lupus erythematosus (SLE). BENLYSTA 10 mglkg already met its primary efficacy endpoint at Week 52 in both BLISS-52 and BLISS-76, as announced in July and November 2009.

At Week 76 in the BLISS-76 study, belimumab plus standard of care showed higher response rates compared with placebo plus standard of care as measured by the SLE Responder Index; however, this secondary endpoint did not reach statistical significance. Study results also showed that belimumab continued to be generally well tolerated, as demonstrated by a similar rate of discontinuations due to adverse events across treatment groups, with overall adverse event rates comparable between belimumab and placebo treatment groups.

"A positive overall picture has emerged from our pivotal Phase 3 studies of BENLYSTA, including its achievement of statistical significance on the primary efficacy endpoint at Week 52 with a favorable safety profile in both BLISS-52 and BLISS-76," said H. Thomas Watkins, President and Chief Executive Officer, HGS.  "We view the results of these studies as strongly supportive of our view that BENLYSTA has the potential to become the first new approved drug in more than 50 years for people living with systemic lupus."

Carlo Russo, M.D., Senior Vice President, Biopharm Development, GSK, said, "Based on the totality of data in BLISS-52 and BLISS-76, we believe that belimumab could deliver a significant therapeutic option for patients with lupus, a chronic condition which has a devastating effect on the lives of patients living with the disease."

13

38.     On June 10, 2010, HGS and GSK issued a joint press release announcing that they had submitted a Biologics License Application ("BLA") to the FDA for approval of Benlysta. The press release stated in relevant part:

> The BLA submission includes the results of two pivotal Phase 3 clinical trials in autoantibody-positive patients with SLE showing that belimumab met its primary endpoint.  In the Phase 3 studies, known as BLISS-52 and BLISS-76, belimumab 10 mglkg plus standard of care achieved a statistically significant improvement in patient response rate as measured by the SLE Responder Index at Week 52, compared with placebo plus standard of care. Study results also showed that belimumab was generally well tolerated in BLISS-52 and BLISS-76, as demonstrated by a similar rate of discontinuations due to adverse events across treatment groups, with overall adverse event rates comparable between belimumab and placebo treatment groups. The design of the two trials was similar, but the duration of therapy in the two studies was different - 52 weeks for BLISS-52 and 76 weeks for BLISS- 76. HGS designed the Phase 3 program for belimumab in collaboration with GlaxoSmithKline (GSK) and leading international SLE experts, and in consultation with the FDA. The two studies treated a total of 1,684 patients.

39.     On June 17, 2010, HGS and GSK issued a joint press release that stated in relevant part:

> ROCKVILLE, Maryland, and LONDON, UK - June 17, 2010 - Human Genome Sciences, Inc. (Nasdaq: HGSI) and GlaxoSmithKline PLC (GSK) today announced the presentation of additional results from BLISS-52, one of two pivotal Phase 3 trials of BENLYSTA® (belimumab) in seropositive patients with systemic lupus erythematosus (SLE). The additional data will be presented in Rome at the 2010 Congress of the European League against Rheumatism (EULAR) on Saturday, June 19.
>
> "The BLISS-52 Phase 3 results presented at EULAR demonstrate that the efficacy of treatment in this study with belimumab plus standard of care was superior to that of placebo plus standard of care," said David C. Stump, M.D., Executive Vice President, Research and Development, HGS. "Belimumab has met the primary endpoint in both of its pivotal Phase 3 trials. Earlier this month, we and GSK submitted marketing applications for belimumab in the United States and Europe. We now look forward to the consideration and conclusions of regulatory authorities."

40.     On that same day, HGS and GSK issued another joint press release that stated in relevant part:

ROCKVILLE, Maryland, and LONDON, UK - June 17, 2010 - Human Genome Sciences, Inc. (Nasdaq: HGSI) and GlaxoSmithKline PLC (GSK) today announced the full presentation of results from BLISS-76, one of two pivotal Phase 3 trials of BENLYSTA® (belimumab) in seropositive patients with systemic lupus erythematosus (SLE). The results will be presented today in Rome at the 20 10 Congress of the European League Against Rheumatism (EULAR). "The BLISS-76 Phase 3 results presented at EULAR extend the findings of previous studies and reinforce our belief that belimumab, assuming regulatory approval, could deliver a significant therapeutic option for seropositive patients with systemic lupus," said David C. Stump, M.D., Executive Vice President, Research and Development, HGS. "In both of its pivotal Phase 3 trials in these patients, belimumab 10 mg/kg met its primary endpoint. The efficacy of treatment with belimumab plus standard of care compared with placebo plus standard of care was superior in both studies, with overall adverse event rates for belimumab comparable to placebo."

Carlo Russo, M.D., Senior Vice President, Biopharm Development, GSK, said, "Belimumab is the first medicine developed specifically for lupus that has reached this late stage of clinical development with positive results. The BLISS-76 results presented at EULAR, taken together with the results of BLISS-52, reinforce our belief that belimumab may play an important role for patients living with lupus."

41.     On June 25, 2010, HGS issued a press release that stated in relevant part:

ROCKVILLE, Maryland - June 25, 2010 - Human Genome Sciences, Inc. (Nasdaq: HGSI) today announced the presentation of additional results from BLISS-76, one of two pivotal Phase 3 trials of BENLYSTA® (belimumab) in seropositive patients with systemic lupus erythematosus (SLE). The additional data will be presented in Vancouver at the 9th International Congress on Systemic Lupus Erythematosus on Friday and Saturday, June 25-26.

"The BLISS-76 Phase 3 results presented at the International Congress on SLE include new data showing that belimumab treatment, consistent with its mechanism of action, resulted in selective and significantly greater reductions in levels of B-cell and plasma B-cell subsets, with significant preservation of memory B-cells," said William W. Freimuth, M.D., Ph.D., Vice President, Clinical Research - Immunology, Rheumatology and Infectious Diseases, HGS. "Importantly, belimumab did not significantly affect the ability of SLE patients to maintain a protective response to vaccines, a finding that is consistent with the preservation of memory B-cells."

42.     On August 19, 2010, HGS and GSK issued a joint press release announcing that the FDA granted a priority review designation to Benlysta. The press release stated in relevant part:

#1633226v.1

The Biologics License Application (BLA) for belimumab was submitted to the FDA on June 9, 2010, and includes the results of two pivotal Phase 3 clinical trials that treated a total of 1,684 autoantibody-positive patients with SLE. HGS designed the Phase 3 program for belimumab in collaboration with GSK and leading international SLE experts, and in consultation with the FDA.

"We are very pleased that FDA has chosen to grant priority review to belimumab, the first in a new class of drugs called BLyS-specific inhibitors," said H. Thomas Watkins, President and Chief Executive Officer, HGS. "We believe that the priority review designation speaks both to the significant medical need of people living with lupus and to the potential belimumab may hold as a new treatment option for these patients."

43.     On October 27, 2010, HGS issued a press release announcing the date of a FDA Advisory Committee meeting regarding Benlysta that stated in relevant part:

In August 2010, the FDA granted a priority review designation to BENLYSTA (belimumab) as a potential treatment for autoantibody-positive patients with clinically active systemic lupus erythematosus (SLE). A priority review designation is granted to drugs that, if approved, offer major advances in treatment or provide a treatment where no adequate therapy exists. The FDA has assigned belimumab a PDUFA target date of December 9, 2010, and an FDA Advisory Committee meeting to consider the belimumab Biologics License Application (BLA) is scheduled to take place on November 16, 2010. No new drug for lupus has been approved by regulatory authorities in more than 50 years.

44.     The statements referenced in ¶¶ 28-43 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them that Benlysta was associated with suicide in clinical studies of the drug.

### THE TRUTH EMERGES

45.     On November 12, 2010, the FDA posted its briefing documents for that meeting. The document stated in relevant part:

There were two completed suicides across the double-blind placebo controlled studies, both in patients treated with belimumab (one each in study L02 and study C1057). In addition there was another completed suicide in a belimumab treated patient during the safety extension period of study L02 (study L99). There were four cases of suicide attempts or suicidal ideation, all in patients treated with

16

belimumab (one each in placebo-controlled studies L02 and C1057, and two in the safety extension period of study L02 called study L99).

\* \* \*

Clearly there is a need for effective therapies in SLE. However whether belimumab's benefits sufficiently outweigh its risks is the crux of the issue. Given that flares and steroid reduction may not be impacted, is a reduction of 4 points in the SELENASLEDAI (the main component driving Study 1056's efficacy result) clinically meaningful? If belimumab only has a modest effect for some patients and manifestations, is a possible increased risk of death, infection, or neuropsychiatric adverse effects worth the potential benefit?

46.     As a result of this disclosure, the price of HGS shares dropped $2.88 or nearly 11%, to close at $23.60 per share on November 12, 2010.

## CLASS ACTION ALLEGATIONS

47.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased the publicly traded securities of HGS during the Class Period (the "Class"), including all persons who acquired the common stock of HGS pursuant and/or traceable to the false and misleading July and December Registration Statements. Excluded from the Class are defendants, directors and officers of HGS and their families and Affiliates.

48.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  HGS had more than 180 million shares outstanding, owned by thousands of persons.

49.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     whether the 1934 Act was violated by defendants;

(b)      whether defendants omitted and/or misrepresented material facts;

(c)      whether defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)      whether defendants knew or recklessly disregarded that their statements were false and misleading;

(e)      whether the prices of HGS securities were artificially inflated; and

(f)      the extent of damage sustained by Class members and the appropriate measure of damages.

50.      Plaintiffs' claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

51.      Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

52.      A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### (Against All Defendants For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder)

53.      Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

54.      This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

18

55.     During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of HGS securities; and (iii) cause Plaintiff and other members of the Class to purchase HGS securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

56.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for HGS securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about HGS's finances and business prospects.

57.     By virtue of their positions at HGS, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose

such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

58.     Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of HGS securities from their personal portfolios.

59.     Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of HGS, the Individual Defendants had knowledge of the details of HGS internal affairs.

60.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of HGS. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to HGS's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of HGS securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning HGS's business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased HGS securities at artificially

inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

61.     During the Class Period, HGS securities were traded on an active and efficient market.   Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased shares of HGS securities at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased said securities, or would not have purchased them at the inflated prices that were paid.  At the time of the purchases by Plaintiff and the Class, the true value of HGS securities were substantially lower than the prices paid by Plaintiff and the other members of the Class.   The market price of HGS securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

62.     By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

63.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

#1633226v.1

## COUNT II

### (Violations of Section 20(a) of the
### Exchange Act Against The Individual Defendants)

64.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

65.     During the Class Period, the Individual Defendants participated in the operation and management of HGS, and conducted and participated, directly and indirectly, in the conduct of HGS's business affairs.  Because of their senior positions, they knew the adverse non-public information about HGS's misstatement of income and expenses and false financial statements.

66.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to HGS's financial condition and results of operations, and to correct promptly any public statements issued by HGS which had become materially false or misleading.

67.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which HGS disseminated in the marketplace during the Class Period concerning HGS's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause HGS to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of HGS within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of HGS securities.

68.     Each of the Individual Defendants, therefore, acted as a controlling person of HGS.  By reason of their senior management positions and/or being directors of HGS, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause,

#1633226v.1

HGS to engage in the unlawful acts and conduct complained of herein.  Each of the Individual

Defendants exercised control over the general operations of HGS and possessed the power to

control the specific activities which comprise the primary violations about which Plaintiff and

the other members of the Class complain.

     69.    By reason of the above conduct, the Individual Defendants are liable pursuant to

Section 20(a) of the Exchange Act for the violations committed by HGS.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against defendants as follows:

    A.    Determining that the instant action may be maintained as a class action under

Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class

representative;

    B.    Requiring defendants to pay damages sustained by Plaintiff and the Class by

reason of the acts and transactions alleged herein;

    C.    Awarding Plaintiff and the other members of the Class prejudgment and post-

judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

    D.    Awarding such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  November 21, 2011        Respectfully submitted,

                    _____
                    John B. Isbister, Federal Bar No. 00639
                    Daniel S. Katz, Federal Bar No. 01148
                    **TYDINGS & ROSENBERG LLP**
                    100 E. Pratt Street, 26th Floor
                    Baltimore, Maryland 21202
                    Telephone:  (410) 752-9700
                    Facsimile:  ( 410) 752-5460

OF COUNSEL:

Marc I. Gross
Jeremy A. Lieberman
**POMERANTZ HAUDEK**
**GROSSMAN & GROSS, LLP**
100 Park Avenue, 26th Floor
New York, New York  10017-5516
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665

Patrick V. Dahlstrom
**POMERANTZ HAUDEK**
**GROSSMAN & GROSS, LLP**
One North LaSalle Street, Suite 2225
Chicago, Illinois 60602
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184

#1633226v.1